

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-09-00272-CR

JON MICHAEL LAYER                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

### FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In six issues, Appellant Jon Michael Layer appeals his conviction on four counts of aggravated sexual assault of a child. We affirm.

### II. Factual and Procedural Background

Layer was accused of committing four counts of aggravated sexual assault of a child.[2] Layer pleaded not guilty, and a jury found him guilty and assessed

----------

[1]*See* Tex. R. App. P. 47.4.

punishment at life imprisonment on each count. The trial court entered judgment on the verdict and ordered that Layer's sentences run consecutively. This appeal followed.

### III. Sufficiency of the Evidence

In his first, second, third, and fourth issues, Layer challenges the factual sufficiency of the evidence to support his four-count conviction. However, the court of criminal appeals has held that there is no meaningful distinction between the legal and factual sufficiency standards. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)). Thus, the *Jackson* standard, explained below, is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Id.*

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

[2]We will address the evidence in greater detail below because Layer challenges its sufficiency.

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. We must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a sufficiency review. *Clayton*, 235 S.W.3d at 778; *Moff v. State,* 131 S.W.3d 485, 489–90 (Tex. Crim. App. 2004).

## B. Evidence

The Layer family moved from Bay St. Louis, Mississippi, to Keller, Texas, because of Hurricane Katrina. They then moved back to Mississippi for a short

3

time before relocating to Wichita Falls, Texas, in June 2007. Layer, his wife Mary, and their three children—B.L., T.L., and A.L.L.—shared a house with Mary's brother and his family. The complainant, thirteen-year-old A.L.L., shared a room with her fourteen-year-old sister T.L. and five-year-old cousin H.O.

### 1. A.L.L.'s May 28, 2008 Outcry

On May 28, 2008, A.L.L. told her school counselor that Layer had molested her; the counselor called Child Protective Services (CPS). As school let out, Wichita Falls Police Officer Alan Killingsworth met the CPS worker at A.L.L.'s school, spoke with A.L.L., and decided to take A.L.L. to the child advocacy center for a forensic interview. Officer Killingsworth stated that as they emerged from the school, A.L.L. and T.L. pointed out Layer to him in the parking lot, but Layer drove away before the officer could speak with him.

At the child advocacy center, Deanee Moran conducted a forensic interview with A.L.L. Moran testified as A.L.L.'s outcry witness, stating that A.L.L. told her the following:

- A.L.L.'s father had been sexually abusing her daily for a long time.

- When A.L.L. was ten years old and the family lived in a FEMA trailer in Mississippi, Layer tried to put his penis in her private part and, on a different occasion, tried to put his penis in her mouth.

- In Wichita Falls in early May 2008, A.L.L. asked Layer for permission to go to a park, and he grabbed her and started "messing with her private part."

- In Wichita Falls in April 2008—about a month before the interview— Layer stuck his hand down the front of A.L.L.'s shorts and touched the inside of her private part. On a different occasion, he told her to

4

sit on his bed, and then he unbuttoned her pants and licked her private part.

- When the family lived in Keller, Mary saw Layer "messing with her"—Layer's hand down her pants, playing with her private part—and Mary asked a bunch of questions.

Moran had A.L.L. mark on an anatomically correct female diagram the portion of the body A.L.L. referred to as her "private part," which she designated as the female sexual organ.

A.L.L. also told Moran that Layer had three or four vibrators in his room. A.L.L. described them and said that he had used two of them on her, sometimes on the inside of her private part. A.L.L. told Moran that Layer would also use the vibrator on his penis and that Layer told her, with regard to the vibrators, to be quiet and "don't tell nobody" and if she did tell, "that he would leave and never come back." After the forensic interview, A.L.L. was taken to a teen shelter.

Officer Killingsworth watched A.L.L.'s forensic interview from the observation room adjacent to the interview room. After the forensic interview, he obtained a search warrant and went to Layer's house. Layer was not home. Officer Killingsworth spoke with Mary and searched Mary and Layer's bedroom, which Layer kept locked, for evidence corroborating A.L.L.'s statements. He found the following items, photographs of which were entered in evidence: a massager vibrator, a pink dildo, a round rubber object that appeared to be a

sexual toy, and two pornographic DVDs entitled "First Time Teens" and "Teenage Fantasies: Anal Virgins."[3]

After leaving Layer's house, Officer Killingsworth went to Layer's friend's nearby house to look for Layer, but to no avail. On May 30, 2008—two days after executing the search warrant—Officer Killingsworth spoke by phone with Layer's sister Pixie, who lived in Keller, and arranged for Layer to make a statement at the Wichita Falls police department on June 2.

### 2. A.L.L.'s May 29, 2008 Follow-up Interview

On May 29, 2008, Officer Killingsworth met with A.L.L. to clarify the details regarding her statements in the forensic interview. She told him that Layer woke her on May 28 by penetrating her female sexual organ with his hand and that this went on until Layer heard T.L. coming out of the bathroom.[4] She also said that Layer had done the same thing to her on May 27. And she described to him an incident that occurred the day the family went to Lucy Park in Wichita Falls, when Layer put his hand down her shorts and her underwear and, again, caused the digital penetration of her female sexual organ and began moving his fingers

---

[3]The cover of the "Teenage Fantasies: Anal Virgins" DVD advertises "Watch As These Teens Take It Up The Ass For The First Time Ever!," and "Young Girls & Hardcore Ass Fucking!," along with supporting photographic depictions.

[4]The girls' morning routine was for T.L. to get up first and go into the bathroom. A.L.L. told Officer Killingsworth that Layer would come into the bedroom while T.L. was in the bathroom.

6

around. Officer Killingsworth's interview with Mary helped him narrow the date of the park visit to May 3, 2008.

A.L.L. also described an incident that occurred at the end of April 2008, on the morning she was supposed to take part of the TAKS test. Her father woke her that morning by performing oral sex on her. Layer had removed her pants and her underwear and had his head under the covers and performed oral sex on her until he heard one of her cousins leaving the adjacent bedroom.[5]

A.L.L. also told Officer Killingsworth about incidents in Keller, such as when Layer tried to force her to perform oral sex on him by forcing her mouth open and forcing her head towards him—she said that she refused and he "got mad and wouldn't talk to her for a week"—and one occasion when Mary walked in and interrupted them when Layer had his hand down her pants. And she told Officer Killingsworth that on more than one occasion, Layer tried to stick his penis in her female sexual organ when they lived in a FEMA trailer in Mississippi.

### 3. Layer's June 2, 2008 Interview

Layer's June 2 interview with Officer Killingsworth was admitted into evidence and published to the jury. Layer began the interview by admitting that he was scared. Layer stated that he thought he had been asked to come to the police station because A.L.L. was "probably accusing [him] of something" and

---

[5]Officer Killingsworth stated that, in his training and experience, having closed out 372 crimes-against-children cases in three years in Wichita Falls, it was not uncommon for a perpetrator to sexually abuse a child with other people in the house or even in the same room.

7

that he had been "dealing with it for a couple of years." Layer repeated several times over the course of the interview that he had been dealing with this problem of A.L.L. making accusations about him for around two years. And he told Officer Killingsworth more than once that when the family lived in Mississippi, he had talked with a few people, including a judge, about what to do about A.L.L. accusing him of "messing with her." Layer stated that the sexual abuse idea was originally A.L.L.'s cousin's, who taught A.L.L. that "little trick" because he was rough on A.L.L. about school.

Layer explained to Officer Killingsworth that A.L.L. had wanted to attend a school dance. Layer and Mary said A.L.L. could go as long as she did not ask to do anything else that summer because money was tight. When A.L.L. could not get into the dance because she was failing two classes, Layer told her that their agreement—that if he brought her to the dance she could not do anything else that summer—would stand. A.L.L. became angry and then made this accusation, as she had done in Mississippi. Layer told Officer Killingsworth that Mary knew about the problem with A.L.L., as did others in Mississippi, because it had been going on for years.[6] Layer also told Officer Killingsworth that the judge Layer had spoken with would be sending a letter and stated, "It is not something that's is [sic] just made up . . . It's been going on for years." As Officer

---

[6]Layer stated, "If they're not telling you what's been going on for two years[,] I'll have a judge with a document stating that it's been going on because I've talked to him about it."

8

Killingsworth continued to question him, Layer stated, "I'm not trying to sweep nothing under the rug. I've been deal with this probably like two years."

Over the course of the interview, Layer mentioned jail several times. When Officer Killingsworth told him that he did not see any reason why Layer could not get probation if he was remorseful, Layer asked, "Can you put that in writing?" and asked Officer Killingsworth if a probation recommendation would be in his report. Layer also told the officer that five different lawyers told him "that y'all are gonna lie to me to get me to admit to it and y'all are just gonna throw me in jail and forget all about me." Then he stated that his sister was actually the one who talked with a lawyer for him.

Layer told Officer Killingsworth that on May 28, he woke up the kids and took them to school and that he usually had to drag A.L.L. out of bed. And he told the officer that he was telling the truth and that he was not "gonna admit to anything because [he] didn't do nothing." Layer explained that he left the middle school when he saw Officer Killingsworth with his daughters because "it's not the first time she's tried to say this to me."

Officer Killingsworth testified that Layer never gave him the name of the Mississippi judge and that he would have followed up if he had had that information. The warrant for Layer's arrest was signed two days after his interview with Officer Killingsworth, and Layer was arrested eight days after the warrant issued, when he turned himself in.

During cross-examination, Officer Killingsworth admitted that he had no fingerprints, DNA, or other scientific evidence, and that no sexual assault exam was performed on A.L.L. He also stated that A.L.L. had made a recantation to the district attorney's office and that it was not unheard of for sexual abuse victims to recant their statements.

## 4. A.L.L.'s Recantation

A.L.L. first read to the jury the note that she wrote during her May 28, 2008 forensic interview:

> I love my mom and my family and I really don't want to leave them. I don't want my dad to leave. He will though—he will though because I told on him. He's probably mad at me. He said that if I told he would pack his stuff and leave. I don't want that, so I keep it a secret. All my life I kept it a secret. I just couldn't hold it anymore. I am really sorry. I'm tired to hold this—I'm tired to hold his secret. I can't hold that kind of secret.

A.L.L. said that after her outcry, her mother was mad at first, that T.L. and her brother were upset and mad, that this had torn her family apart, and that she was placed in a children's home for three weeks. A.L.L. then read to the jury her recantation letter dated September 29, 2008:

> The truth has to come out and my dad did not do it to me. I only said that because I did not want to be grounded for the summer, for going to the dance in which I did not go to. I wanted to go to camp because we—I wanted to go to camp because we didn't have time to, but I went anyway.

At trial, A.L.L. explained that she was not telling the truth when she wrote the recantation and that she was mad when she wrote it because she had been telling the truth before. She was unhappy when she wrote the recantation

10

because Layer was in jail and her life had changed. She admitted that she had lied when she told Mary, her brother, and T.L. that Layer did not touch her. On redirect, A.L.L. stated that she was telling the truth at trial.

Mary took the September 2008 recantation letter, copied it, and took A.L.L. to see Layer's lawyer. Mary stated that she had taken A.L.L. to see Layer's defense attorney because she was trying to make A.L.L. happy. She said that A.L.L. had wanted to know "what would have to be done in order for her dad—for her recantation to work," and they talked about an affidavit of nonprosecution, which Layer wanted Mary to get A.L.L. to sign. Mary testified that A.L.L. had talked about recanting at the beginning of August 2008, then had written out a letter recanting her outcry, discussed it with Mary, and dated it.

Mary stated that she did not believe A.L.L.'s recantation and that she thought A.L.L. had signed it because "[s]he [didn't] want her daddy in jail and she [didn't] want to feel like she's responsible for that and she loves him and she wants him free, but she [didn't] want him home." Mary testified during cross-examination that A.L.L. "has been known to be very untruthful" but then contradicted herself on redirect by admitting that during her grand jury testimony she had stated that A.L.L. had good character for truthfulness. A.L.L. stated that

11

after recanting, she "was told that if [she] didn't tell the truth [she] was going to be put in jail," that someone had told Mary this, and that Mary had told her.[7]

Julie Porter, a counselor, testified that she had met with A.L.L. from June 19, 2008, to April 2, 2009. In their first counseling session, A.L.L. told her that she felt sad and guilty about her father being in jail. In the next session, A.L.L. expressed worry about what was happening to Layer and said she missed him and felt to blame for him being in jail. A.L.L.'s feeling guilty was a recurring theme during her counseling sessions. In one of the earlier sessions, A.L.L. also told Porter that the abuse had gone on for as long as she remembered and that she had told a friend at school because she "just couldn't keep it in anymore."

At their August 14, 2008 session, Mary and T.L. brought A.L.L. to counseling, and A.L.L. seemed withdrawn; Mary told Porter that A.L.L. knew Mary had upcoming testimony before a grand jury. At the session on September 11, 2008, A.L.L. said that her brother had told her it was her fault that Layer was in jail and that T.L. was not speaking to her.

At the session on September 25, 2008, A.L.L. seemed happier and said she was getting along better with her siblings. After the October 9, 2008 session, Porter learned from Mary that A.L.L. had recanted. At the October 23, 2008 session, A.L.L. seemed reluctant to discuss the recantation letter and said that

---

[7]Mary testified that one of the district attorneys had told her about the consequences of false statements under oath and that A.L.L. had overheard Mary talking with her brother on the phone about it.

she did not remember what the letter said. At their November 6, 2008 session, A.L.L. expressed anger at the court for not allowing her to visit her father, and at the November 20, 2008 session, A.L.L. indicated that she was getting more support from her family after recanting. Porter stated, with regard to A.L.L.'s recantation, "I think [A.L.L.] felt under family pressure. I think she felt guilty and to blame for her dad to be in jail."

### 5. A.L.L.'s Testimony about Abuse

A.L.L. testified that she was in preschool the first time Layer touched her inappropriately. They were in the car, and he touched her private area with his hand. He then did it every day, and he told her that if she told anyone about it, he would leave and never come back. She never spoke out because he "was going to get mad at [her] if [she] did" and because he said he would hurt her if she told.

A.L.L. testified that when they lived in Mississippi, Layer did not do anything more than touch her private area, but she also testified that when they lived in a trailer park in Mississippi, Layer tried to penetrate her anus with his penis. She did not remember how old she was when this occurred, but she stated that she was elementary school-age and that it hurt. Layer also touched her private area with vibrators. She never told anyone in Mississippi about the sexual abuse.

When they moved to Keller, he continued to touch her inappropriately "inside of the crack" of her private area when no one else was around. Layer would touch her "maybe about three times a day" every day.

When the family moved to Wichita Falls, Layer continued to touch her. Layer came into the girls' bedroom in the morning and "st[u]ck his hand down [her] pants." A.L.L. pretended to be asleep because she did not want to wake her cousin. She denied that Layer ever tried to perform oral sex on her in Wichita Falls but stated that he had tried unsuccessfully when they lived in the Mississippi trailer park. A.L.L. also testified that Layer called her into the computer room and told her to watch dirty videos with him.

A.L.L. stated that she had told the truth to her school counselor and Moran. On cross-examination, A.L.L. stated that although she once said that she had told T.L. and Mary about the abuse, this was a lie, as was an occasion she had described as Mary screaming when she saw Layer appear to be sexually abusing A.L.L.

A.L.L. testified that Layer had touched her inappropriately in April 2008 before she took the TAKS test, on the day she outcried, and most mornings when he came to wake her, and she stated that he had touched her inappropriately on the inside of the crack of her private part with his fingers more than five times while they lived in Wichita Falls. But she also stated that nothing had occurred on the day she wanted to go to Lucy Park, that Layer had never

14

tried to have sex with her when they lived in Wichita Falls, and that Layer had never tried to perform oral sex on her when they lived in Wichita Falls.

### 6. Dr. William Carter's Testimony

Dr. William Lee Carter, Ed.D., a psychologist, testified that it was not unusual for a perpetrator to pick one child and leave the other child alone and that the type and severity of abuse would tend to escalate as the molestation continued and the child told no one. He stated that, based on A.L.L.'s testimony, this is what he thought happened, stating,

> She spoke about how when—when she was first touched, she was simply touched while in the car. She then went on to speak of how he would do other things, such as trying to have sex with her, apparently trying to have oral sex, eventually as she gets older, bringing her in and showing her pornography, all of those things in my mind suggest an increase or an escalation in the sexual abuse events.

Dr. Carter testified that showing A.L.L. pornography could be a form of grooming behavior, "setting her up for something worse as she got older." He also stated that most sexual abuse victims delay their outcries to some degree and that anxiety can create minor somatic discomfort, such as a stomachache, when a child is victimized. And Dr. Carter testified that a big reason that sexual abuse victims make recantations is because of the guilt, shame, and blame following making an outcry. On cross-examination, he admitted that a recantation could also be consistent with a child that has not been sexually abused.

### 7. Mary Layer's Testimony

Mary testified that Layer usually took the children to school and picked them up afterwards because her driver's license was expired. On May 28, Layer went to retrieve A.L.L. and T.L. but came home without them or his car, looking upset. He did not tell Mary why he did not bring A.L.L. and T.L. home from school. Instead, he told Mary that she would have to go pick them up from school, even though he knew she did not have a valid driver's license. He told her that he had parked the suburban at a grocery store two blocks away, telling her that he left it there because it was low on gas. Mary said that this did not make any sense to her.

Mary went to the school and found T.L. T.L. gave her a paper from CPS that stated that CPS had A.L.L. and that listed a phone number for her to call. When Mary found out from CPS about A.L.L.'s allegations against Layer, she felt sick. CPS removed not only A.L.L. but also T.L., and Mary was not happy about either removal.

Later that afternoon, when Mary returned home, she learned Layer was at a friend's house nearby and that he was sick with chest pains. She told him that CPS had removed the girls and about A.L.L.'s allegations. Layer told her that he had not done anything wrong. That evening, Officer Killingsworth came to her house to execute a search warrant. The next day, Layer called her and told her that he was innocent, that he had had a stroke, and that he was in Keller with his sister. She stated that Layer knew the police wanted to ask him some questions.

Mary stated that A.L.L. had always been a "daddy's girl," and she stated more than once that she could not think of any reason why A.L.L. would make up allegations of sexual molestation against her father. Mary also said that the reasons A.L.L. gave in her recantation did not make sense to her.

Mary said that to her knowledge there had never been problems in the past of A.L.L. making false accusations against Layer or Layer taking his concerns about such accusations to friends and a judge in Mississippi. Mary also said that, other than Layer's personal knowledge, Layer would have no idea when he drove up to the school on May 28 why the detective was there with his daughters because A.L.L. had never made any allegations prior to May 28. Before May 28, she had asked both of her girls on several occasions whether their father had been "messing with" them, and A.L.L. had always previously said no. Mary noted that A.L.L. had endured frequent stomachaches since she was a child, and after the molestation allegations came out, she thought it was possible that stress from the molestation had caused them.

Mary described an incident in Keller when A.L.L. was ten years old and she saw Layer and A.L.L. on the sofa. From where she was standing, it looked like Layer was fondling A.L.L. She stated that she walked up to the sofa and confronted the situation. Layer and A.L.L. told her that they were not doing anything, and once she saw their positions clearly, she could tell that she had been wrong. The prosecutor then brought out her May 28 statement to Officer Killingsworth with regard to her response to the officer's question about if she

17

knew of any inappropriate behavior or activity and quoted her response about the Keller incident:

> To me it looked like he was fondling her. I couldn't get an accurate answer from no one. . . . So I just [told] both of them how inappropriate that looked and how inappropriate it was and him knowing that I came from the background that I came from . . . . He knows that I would not accept it.

Mary excused the differences by saying that she was really "out there" on May 28 and that she had now had time to remember.

Mary testified that she believed that Layer sexually assaulted A.L.L., but she also admitted that she has stayed in constant contact with Layer and that she would always love him. She stated that loving Layer was engrained in her—she was fifteen when she met him and they had been married for seventeen years—but that it did not mean anything and that she did not have the money for a divorce. She admitted that she talked with Layer about A.L.L.'s filing an affidavit of nonprosecution but stated that she also told A.L.L. not to sign one.

### 8. A.L.L.'s Name

Officer Killingsworth testified that he had learned that A.L.L.'s first name and middle name were the same as the first and last name of a pornographic film star who, between 1993 and 2004, had starred in almost 200 films. Mary testified that she decided on A.L.L.'s first and middle names and that she found out only after naming A.L.L. that A.L.L. shared the same name as a porn star.

Kitten Hotard, Layer's second cousin and a former crack addict, testified that she had visited the Layers at the end of 1999 and beginning of 2000. One

18

afternoon during the visit, she, Layer, Mary, and another guy sat around in the living room, drinking beer and talking about how people had gotten their names. The Layers' son was named after an uncle, and T.L. was named after Layer's mother. And then Layer said that A.L.L. was named after a porn star and that "her name altogether was [A.L.L.] so that one day he could lay her."

### 9. K.S.A.T.'s Testimony

The State's final witness, K.S.A.T., testified that she was six years old on February 12, 1986. Her mother dropped her off at the babysitter's house. The babysitter's boyfriend—who was a white male in his late teens or early twenties—was there. When the babysitter went upstairs, the boyfriend called K.S.A.T. over to the sofa and put his hand down her pants. The babysitter came downstairs and saw this happen. K.S.A.T. ran from the house as her mother's car pulled up, and she told her mother what had happened. The police interviewed her, and she learned that the babysitter's boyfriend's name was Jon Layer. After K.S.A.T.'s testimony, Layer stipulated that he was the man identified by K.S.A.T.

## C. Analysis

All four counts of the indictment alleged that Layer's acts occurred in Wichita County. The first three counts alleged that Layer had penetrated the female sexual organ of A.L.L., a child younger than fourteen years, with his finger on or about May 3, 27, and 28, 2008, and the fourth count alleged that he had

19

caused A.L.L.'s sexual organ to contact his mouth on or about April 30, 2008. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i), (iii) (Vernon 2010).

In his first issue, Layer argues that the fundamental issue before this court is what to make of A.L.L.'s recantation and conflicting testimony about when and how Layer molested her. Layer argues that based on A.L.L.'s recantation and testimony, the evidence is too weak to support his conviction and that this court should not "embrace the jury's a la carte approach to [A.L.L.'s] testimony— putting it on the tray when her testimony supports a conviction and putting it back on the tray when it doesn't."[8]

We initially observe that the State is not required to prove the specific date the offense occurred when the indictment alleges an "on or about" date and that the evidence is sufficient if it proves the offense occurred on a date anterior to the presentment of the indictment but within the statutory limitation period. *Sledge v. State*, 953 S.W.2d 253, 255–56 (Tex. Crim. App. 1997). Additionally, a child complainant's testimony, standing alone, can be sufficient to support an aggravated sexual assault conviction. Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1) (Vernon 2005); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App.

---

[8]In his second, third, and fourth issues, Layer makes similar complaints, contending that A.L.L.'s counselor's testimony is not sufficient to support his conviction for the May 27 count; that A.L.L.'s testimony that nothing happened in the "park episode" leaves the evidence insufficient to convict him on the May 3 count; and that A.L.L.'s testimony that Layer never tried to perform oral sex on her in Wichita County renders the evidence insufficient to convict him of the April 30 count.

[Panel Op.] 1978); *see also Bazanes v. State*, 310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref'd) (citing *Garcia).* And a child victim's outcry statement alone can be sufficient to support a conviction for aggravated sexual assault. *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd), *cert. denied*, 538 U.S. 963 (2003); *see also Kimberlin v. State*, 877 S.W.2d 828, 831–32 (Tex. App.—Fort Worth 1994, pet. ref'd) (citing *Rodriguez v. State*, 819 S.W.2d 871, 873 (Tex. Crim. App. 1991)).

The record reflects that the Layer family moved to Wichita Falls in June 2007. The record also reflects that, after the morning of May 28, 2008, Layer no longer had the opportunity to touch A.L.L. A.L.L. testified that while the family lived in Wichita Falls, Layer had touched her inappropriately more than five times on the inside of the crack of her private part with his fingers. Moran, the outcry witness, testified that A.L.L. told her that around a month prior to her forensic interview, Layer had licked her private part. And on Moran's anatomically correct female diagram, A.L.L. circled the female sexual organ as what she meant by "private part." Viewed in the light most favorable to the prosecution, we conclude that the jury could have found that Layer committed three counts of penetration of A.L.L.'s female sexual organ with his finger and one count of causing A.L.L.'s sexual organ to contact his mouth.[9] *See Klein v. State*, 273 S.W.3d 297, 298–99,

---

[9]Additional evidence supporting the jury's conviction on all four counts included Layer's flight from the middle school and failure to return to Wichita Falls for over a week after he saw Officer Killingsworth with his daughters, *see Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight

302–03 (Tex. Crim. App. 2008) (holding, despite child's recantation and lack of specific dates, that the evidence was legally sufficient that the sexual assaults occurred "on at least four separate occasions" when testimony established that during a specific time period of four to six weeks, appellant touched the child's sexual organ with his fingers and tongue "most nights"); *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("The jury observed the complainant's demeanor and was entitled not only to reconcile any such conflicts [in her testimony], but even to disbelieve her recantation.").

Although there may have been some conflicts in the evidence, they were for the jury to resolve, and we may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Brown*, 270 S.W.3d at 564; *Williams*, 235 S.W.3d at 750; *see also Bell v. State*, 693 S.W.2d 434, 443 (Tex. Crim. App. 1985) ("[T]he jury, as the sole trier of fact, was entitled to believe all or part of the conflicting testimony proffered and introduced by either side."). We hold that the evidence is legally sufficient to support Layer's conviction on all four counts, and we

evinces a consciousness of guilt."); Layer's interview, in which he claimed that Mary and a judge knew about A.L.L.'s making allegations and that the judge would be sending a letter about it, as compared to Mary's testimony that May 28 was the first time A.L.L. had made an allegation of abuse, and the conspicuous absence of any letter from a judge; the sexual toys recovered from Layer's bedroom that corroborated A.L.L.'s forensic interview statements; K.S.A.T.'s testimony about how Layer molested her when she was six years old by putting his hand down her pants while the babysitter was upstairs; and Layer's cousin's disturbing testimony about how Layer had chosen A.L.L.'s name.

overrule Layer's first issue. And because we conclude that the evidence is legally sufficient to support Layer's conviction on all four counts, we overrule his second, third, and fourth issues as well.

## IV. Testimony

In his fifth issue, Layer argues that the trial court abused its discretion by allowing K.S.A.T. to testify about sexual contact between them when she was a child during the trial's guilt-innocence phase. Our court of criminal appeals has stated:

> Our case law supports a decision that a defense opening statement . . . opens the door to the admission of extraneous-offense evidence . . . to rebut the defensive theory presented in the defense opening statement. *See Powell v. State*, 63 S.W.3d 435, 438–40 (Tex. Crim. App. 2001) (in prosecution for indecency with a child, defendant's opening statement that he lacked opportunity to molest the complainant under the circumstances of the charged offense opened the door to admission of extraneous-offense evidence that defendant molested others under almost identical circumstances to rebut defendant's lack of opportunity defensive theory); *see also Daggett v. State*, 187 S.W.3d 444, 453–54 (Tex. Crim. App. 2005) (in prosecution for sexual assault of [a] child under seventeen, defendant's sweeping direct-examination testimony disavowing any sexual misconduct with minors opened the door to admission of extraneous-offense evidence of defendant's sexual misconduct with another minor to rebut this sweeping testimony).

*Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008). The issue does not necessarily turn on the type of defense presented but on whether the extraneous-offense evidence has noncharacter-conformity relevance by, for example, rebutting a defensive theory or making less probable defensive evidence that undermines an elemental fact. *Id.* at 563 n.8 (citing *Powell*, 63

23

S.W.3d at 438).  In *Bass*, the court held that the trial court did not abuse its discretion when it admitted extraneous-offense evidence to rebut the appellant's defensive theory, introduced in his opening statement, that the complainant had fabricated her allegations against him.  *Id.* at 557, 563.

Layer claims that *Powell* and its progeny do not apply because K.S.A.T.'s testimony "was not given to rebut a small parade of witnesses favorable to" him. However, during his opening statement, Layer addressed the jury as follows:

> Now, the question that you're going to have at the end of the day, I believe, is that we're going to conclude that there is a victim in this case.  The question is, who is it?  Is it the little girl or is it the little girl's father?
>
> I believe that the evidence that we're going to hear is that the little girl has got a reputation that perhaps may not be everything that it should be for truth, honesty, fair dealing.  I believe that we're going to hear from the girl's mother's mouth that she—that the little girl has a history of not telling the truth.
>
> . . . .
>
> [A]t the end of the day, the question that you're going to have to address is:  Did [Layer] do what the little girl [said] or is she making it up?

Defense counsel then listed everything that he thought the State would fail to bring, such as DNA evidence and fingerprints, before reiterating his theme that A.L.L. was a liar and that Layer was her victim.

Layer raised fabrication by A.L.L. as his theory during his opening statement, opening the door to the admission of K.S.A.T.'s testimony by the State to rebut this theory, in addition to rebutting testimony brought out on cross-

examination with regard to A.L.L. telling the truth. *See id.* Therefore, we conclude that the trial court did not abuse its discretion by admitting this testimony during the trial's guilt-innocence phase, and we overrule Layer's fifth issue.

## V. Consecutive Sentences

In his sixth issue, Layer argues that the trial court abused its discretion by ruling that his sentences were to be served consecutively because, under the circumstances presented here, a cumulative sentence "has the practical effect of working an injustice on [him]" when A.L.L. had failed to recall the abuse on May 27 or the abuse related to the "park" incident during her testimony.

We review a trial court's decision to cumulate sentences for an abuse of discretion. *Strahan v. State*, 306 S.W.3d 342, 351 (Tex. App.—Fort Worth 2010, pet. ref'd). A trial court may cumulate sentences for aggravated sexual assault "committed against a victim younger than 17 years of age at the time of the [offense's commission,] regardless of whether the accused is convicted of violations of the same section more than once or is convicted of violations of more than one section." Tex. Penal Code Ann. § 3.03(b)(2)(A) (Vernon 2009). Notwithstanding Layer's complaint about A.L.L.'s testimony above, we cannot say on the record presented here—as recounted extensively above—that the trial court abused its discretion by cumulating his sentences. We overrule Layer's sixth issue.

25

## VI.  Conclusion

Having overruled all of Layer's issues, we affirm the trial court's judgment.


PER CURIAM

PANEL:  MCCOY, J.; LIVINGSTON, C.J.; and DAUPHINOT, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 7, 2011